UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
———————————————————————

UNITED STATES OF AMERICA,

                    Plaintiff,

        v.

PATRICK CHRISTNER and CIARRA CRANE,

                Defendants.

———————————————————————

DECISION & ORDER and
REPORT & RECOMMENDATION

13-CR-6025CJS

## PRELIMINARY STATEMENT

By Order of Hon. Charles J. Siragusa, United States District Judge, dated

September 12, 2013, all pretrial matters in the above captioned case have been referred to this

Court pursuant to 28 U.S.C. §§ 636(b)(1)(A)-(B).  (Docket # 34).

On September 9, 2014, the grand jury returned a third superseding indictment

against Tyshawn Simmons ("Simmons"), Marquis McMillian ("McMillian"), Franklin Brock, Jr.

("Brock, Jr."), Melvin Hill ("Hill"), Franklin Brock, Sr. ("Brock, Sr."), Patrick Christner

("Christner"), Tina McDonald ("McDonald"), and Ciarra Crane ("Crane").  (Docket # 362).

Relevant to this decision, the first count of the ten-count superseding indictment charges all of

the defendants, along with Tashaka Mitchum, Schmillion Weaver and Devin Allen-Furtick, with

conspiring from January 2006 through April 2013 to possess with the intent to distribute and to

distribute heroin, cocaine, cocaine base and marijuana, in violation of 21 U.S.C. § 846.  (*Id.*).

Currently pending before this Court are motions by Crane for a bill of particulars

and for disclosure of the identity of confidential informants.  (Docket ## 219-1 at ¶¶ 13-22; 285).

Before the Court for Report and Recommendation are Crane's and Christner's motions to suppress evidence obtained pursuant to wiretaps (Docket ## 219-1 at ¶¶ 33-50; 310 at ¶¶ 18-54), Crane's motion to suppress tangible evidence[1] (Docket # 219-1 at ¶¶ 51-53), and Christner's motion to suppress evidence of a photographic identification procedure[2] (Docket # 310 at ¶¶ 11-17).  For the reasons discussed below, I deny without prejudice Crane's motion for a bill of particulars and identification of confidential informants and recommend that the district court deny Crane's motion to suppress tangible evidence seized from 350 Hudson Avenue, Christner's motion for suppression of evidence of a photographic identification procedure, and both defendants' motions to suppress wiretap evidence.

## FACTUAL BACKGROUND

### I.   Wiretap Applications

On June 15, 2012, Monroe County Court Judge Victoria M. Argento signed an eavesdropping warrant to intercept oral and text communications over a mobile telephone assigned number (585) 465-7104 (the "target number").  (Docket # 219-4 at 1-13).  Joseph Briganti ("Briganti"), an investigator employed by the Rochester Police Department ("RPD"),

---

[1]   Crane filed omnibus motions seeking other forms of relief including, *inter alia*, an audibility hearing, *Brady* material, a conspiracy hearing, discovery and inspection, Rule 404(b), 608 and 609 evidence, leave to join motions filed by co-defendants, *Jencks* material, preservation of rough notes, leave to file additional motions, disclosure of plea agreements, disclosure of redactions in wiretap affidavits, and voir dire of government experts. (Docket # 219-1). Crane also reserved her right to file a severance motion with the district judge.  (Docket ## 219-1 at ¶¶ 64-65; 254).  Each of the above-referenced motions was decided by the undersigned or resolved by the parties in open court on December 19, 2013.  (Docket ## 253, 254).

[2]   Christner filed omnibus motions seeking other forms of relief including, *inter alia*, a bill of particulars, *Brady* material, a conspiracy hearing, disclosure of witness list, discovery and inspection, Rule 404(b), 608 and 609 evidence, identification of informants, *Jencks* material, leave to file additional motions, *in camera* review of personnel files, disclosure of mail cover, electronic surveillance, non-testifying witness statements, non-electronic surveillance, grand jury materials, co-conspirator statements, and mental health records.  (Docket # 310).  Christner also reserved his right to make a severance motion before the district judge and withdrew his motion to suppress statements.  (Docket ## 310 at ¶¶ 7-10, 88; 324).  Christner also reserved his right to file a severance motion with the district judge.  (Docket # 310 at ¶ 88).  Each of the above-referenced motions was decided by the undersigned or resolved by the parties in open court on April 22, 2014.  (Docket ## 323, 324).

submitted an affidavit in support of his application for the warrant.  (*Id.* at 21-48).  In issuing the

warrant, Judge Argento concluded that there was probable cause to believe that evidence of the

following crimes would be obtained through use of the eavesdropping warrant:

1. Attempted Murder in the Second Degree, in violation of New York Penal Law §§ 110.00 and 125.25;

2. Assault in the First Degree, in violation of New York Penal Law § 120.10;

3. Criminal Possession of a Weapon in the Second Degree, in violation of New York Penal Law § 265.03(1);

4. Criminal Possession of a Weapon in the Third Degree, in violation of New York Penal Law § 265.02; and

5. Attempt or conspiracy to commit the above-listed crimes.

(*Id.* at 1-2).  According to Briganti, the goal of the investigation was to obtain additional

evidence pertaining to the June 5, 2012 shooting of an individual hereinafter referred to as

"CW-1", including locating the weapon used during the shooting.  (*Id.* at 38).

On June 25, 2012, Briganti applied for an amended warrant authorizing the

interception of communications over the target number.[3]  (Docket # 219-5 at 9-29).  The warrant

broadened the crimes under investigation, and the related communications permitted to be

intercepted, to include narcotics trafficking, in violation of New York Penal Law § 220.00.  (*Id.*

at 12-13, ¶ 7).  According to Briganti, the goals of the investigation included gathering evidence

relating to a narcotics trafficking and distribution network operated by Simmons, as well as the

shooting of CW-1 and the location of the weapon used during the shooting.  (*Id.* at 19).  The

following is a summary of the relevant facts set forth in each of Briganti's affidavits.[4]

---

[3]  The parties have not submitted a copy of the June 25, 2012 wiretap warrant to this Court.

[4]  Crane and Christner challenge the wiretaps on the grounds that Briganti's affidavits did not establish that traditional investigative techniques had been or likely would be unsuccessful, not on the grounds that the warrants

A.     __June 15, 2012 Wiretap__

According to Briganti, RPD had been involved in an investigation of Simmons and others for violent crimes committed in the City of Rochester.  (Docket # 219-4 at 26-27).  According to Briganti, in 2006 Devante Spencer ("Spencer"), McMillian's brother, was shot inside 122 Roycroft Street.  (*Id.*).  The investigation of that shooting revealed that 122 Roycroft Street was a drug house operated by Hill.  (*Id.*).  In 2008, Hill was arrested and charged with federal weapons charges.  (*Id.*).  He pled guilty and was sentenced to a term of incarceration of sixty months.  (*Id.*).

On May 15, 2012, Spencer, who was at the time incarcerated in the Monroe County Jail, placed a telephone call from the jail to an unidentified woman and requested that she give him the phone number for "Marquis."  (*Id.* at 28).  The woman provided the number "943-9491" and, at Spencer's request, called McMillian.  (*Id.*).  That same day, two RPD officers stopped a vehicle that Tashaka Mitchum ("Mitchum") was driving for a traffic violation and because it fit the description of a vehicle that had just been involved in a shooting.  (*Id.*).  According to Briganti, Mitchum was an associate of Simmons and McMillian, and McMillian had previously been observed driving the same vehicle.  (*Id.*).  Mitchum was taken to the police station for an interview, and one of the officers remained with the vehicle.  (*Id.*).  That officer was approached by an unknown woman who asked whether McMillian was in the vehicle.  (*Id.*).  After being informed that he was not, the woman left.  (*Id.*).  A cell phone located in the vehicle received several calls from the target phone number (585-465-7104) and McMillian's number (585-943-9491).

---

were unsupported by probable cause.  (Docket ## 219-1 at ¶¶ 33-47; 310 at ¶¶ 18-54).  Thus, the description of the information in the wiretap applications is limited to that relevant to the analysis of "necessity."  Crane also challenges the execution of the wiretaps on the grounds that the warrants' minimization requirements were violated. (Docket # 219-1 at ¶¶ 48-50).

On June 5, 2012, CW-1 was shot at 18 Manitou Street, Rochester, New York, and transported to Strong Memorial Hospital ("Strong").  (*Id.* at 29).  On June 7, 2012, Briganti and other investigators interviewed CW-1 in the hospital.  (*Id.* at 32).  CW-1 informed Briganti that he had been riding his motorcycle on Fernwood Avenue and observed a "black SUV type rental vehicle" parked on Manitou Street.  (*Id.*).  According to CW-1, "Ty" or "Tyshawn" was in the driver's seat, another man whose nickname is "Little Frank" was in the front passenger seat, and "Dap" (McMillian) was in the rear passenger seat.  (*Id.*).  CW-1 stated that he had known McMillian for approximately two years and had played basketball with him.  (*Id.* at 33).  CW-1 stated that he rode onto Manitou Street and saw two individuals in a gold Acura.  (*Id.*).  CW-1 stopped to speak to the individuals, one of whom indicated that "Dap and them was around." (*Id.*).  While he was talking to the individuals, CW-1 heard one of them say, "There's Dap, Look out!"  (*Id.*).  CW-1 then heard three shots and fell off of his motorcycle.  (*Id.*).  As he was crawling on the ground, he heard several more shots and observed "Dap" holding a black handgun, laughing, and running towards Fernwood Avenue.  (*Id.*).

On June 6, 2012, RPD executed a search warrant at 30 Strathmore Circle, Apartment C.  (*Id.* at 29).  That same day, RPD arrested McMillian for operating a vehicle without a license.  (*Id.*).  The vehicle that McMillian was driving was registered to an individual whose address was 30 Strathmore Circle, Apartment C.  (*Id.*).  McMillian was transported to and detained in the Monroe County Jail.  (*Id.*).

Phone recordings from the Monroe County Jail reveal that later that day McMillian called Simmons on the target number.  (*Id.* at 29).  During the phone call, McMillian indicated that he had been stopped by law enforcement as soon as he had entered his vehicle and that law enforcement had "thought [he] was leaving out the crib with that shit."  (*Id.* at 30).

McMillian also reported that an officer had told him that he had been under surveillance and that "this guy sitting on his motorcycle yesterday said you hit him." (*Id.*). Based upon his training and experience, Briganti believed that McMillian had been informing Simmons that law enforcement believed that McMillian had left the Strathmore Circle apartment with his gun and that the "guy on the motorcycle" was a reference to CW-1, who had been shot while sitting on his motorcycle the previous evening. (*Id.* at 30-31). According to Briganti, McMillian's statements to Simmons during the call that "I'm gonna holler at you as soon as you come[;] I gotta tell you some shit too" suggested that McMillian wanted to talk to Simmons in person and wanted Simmons to post bail for him. (*Id.* at 31).

According to Briganti, Simmons posted bail for McMillian later on June 6, 2012. (*Id.*). Simmons arrived in a minivan registered to EAN Holdings. (*Id.*). Subpoenaed records revealed that Alexis Mouzan ("Mouzan") had rented a 2012 Black Chevy Traverse on May 19, 2012, and had exchanged the vehicle on June 5, 2012 for the minivan that Simmons was driving when he arrived at the jail. (*Id.* at 32). Briganti learned from a representative of the rental company that the 2012 Chevy Black Traverse rented by Mouzan had been exchanged for a new rental at 9:04 p.m. on June 5, 2012, approximately two hours after CW-1 had been shot. (*Id.* at 37). The call detail records for the target number show an outgoing call to and subsequent incoming call from Mouzan after the shooting. (*Id.*).

Briganti obtained the target number's call detail records, including cell site information. (*Id.*). Those records revealed that the target number placed an outgoing call at 7:24 p.m. on June 5, 2012, approximately one minute after the shooting of CW-1. (*Id.*). Analysis of cell site information, including the cell tower's location and beamwidth, showed that the call "could have been made in close proximity" to the location of the shooting. (*Id.*).

6

On June 8, 2012, law enforcement officers observed Simmons driving a black 2012 Nissan Murano.  (*Id.* at 33).  Rental company records revealed that Mouzon had returned the minivan at approximately 4:00 p.m. on June 6, 2012, and had exchanged it for a black 2012 Nissan Murano.  (*Id.*).  Later that day, at approximately 8:57 p.m., RPD officers stopped the 2012 Nissan Murano; Simmons was the driver, and McMillian was a passenger.  (*Id.*).

According to Briganti, CW-1 had been scheduled to be released from Strong on June 14, 2012.  Briganti believed that Shakita Hill, the mother of Simmons's child, who worked at Strong, was likely to inform Simmons of the pending release and that CW-1 and others continued to be in danger.  (*Id.* at 34-35).

On June 10, 2012, RPD received a tip from an anonymous informant that "Marquis Sherod Spencer," also known as "Bap," had committed the shooting that occurred near Clifford Avenue and North Goodman Street and was suspected to have committed the shooting of CW-1 on Manitou Street.  (*Id.*).  The caller reported that Marquis and his girlfriend were making plans to leave Rochester and travel south.  (*Id.*).  According to Briganti, Marquis's last name is McMillian, but his brother's last name is Spencer.  (*Id.*).

Briganti reported that on June 11, 2012, Simmons was observed driving a 2012 Dodge Durango rented by Mouzon.  (*Id.* at 36).  On June 12, 2012, an RPD officer was approached by Hill's brother while patrolling an area that Simmons and McMillian were known to frequent.  (*Id.*).  Hill's brother informed the officer that he did not need to patrol the area because nothing was going on.  (*Id.*).  Based upon his knowledge of the investigation, Briganti interpreted this to mean that Simmons and other unknown accomplices had traveled south to avoid apprehension.  (*Id.*).

On June 12, 2012, Briganti obtained emergency ping and call detail records for the target number.  (*Id.* at 35-36).  The call detail records from June 10, 2012 through the early morning hours of June 12, 2012 revealed numerous calls between the target phone number and Mouzon's phone number, Shakita Hill's number, and McMillian's number.  (*Id.* at 36).  Additionally, the records revealed that the target phone number made two outgoing calls to the car rental company on June 12, 2012.  (*Id.*).

On June 15, 2012, Simmons was observed driving the 2012 Dodge Durango with Mitchum as a passenger.  (*Id.*).  According to Briganti, he received updates approximately every fifteen minutes from the phone company informing him of the location of the target phone, which corresponded with the observed location of the Durango.  (*Id.*).

Briganti subpoenaed the call details records for the target number between June 1, 2012 and June 15, 2012, which revealed approximately 4,000 calls, 86 of which were between the target number and Mouzon's number, and 69 of which were between the target number and McMillian's number.  (*Id.* at 36-37).

**B.**    **June 25, 2012 Wiretap**

Briganti's affidavit in support of his June 25, 2012 application for the amended warrant summarized the ongoing investigation, including information obtained as a result of the June 15, 2012 wiretap order, as well as a June 11, 2012 GPS tracking device warrant.  (Docket # 129-5 at 13-14).  Pursuant to that warrant, on June 17, 2012, a GPS tracking device was installed on the Dodge Durango that Simmons was driving.  (*Id.*).

According to Briganti, on June 19, 2012 he intercepted a phone call on the target number between Simmons and Christner.  (*Id.* at 14).  Based upon his training, experience and knowledge of the case, Briganti believed that Simmons told Christner that he had cocaine that he

wanted to show and possibly sell to Christner.  (*Id.*).  Simmons directed Christner to meet him at a location near an identified school.  (*Id.*).  According to Briganti, the GPS tracking device indicated that the Dodge Durango was parked in the area of 350 Hudson Avenue, which was located near the school identified by Simmons.  (*Id.*).

Approximately twenty-eight minutes later, Simmons received a phone call from Christner to advise that he would arrive in five or ten minutes.  (*Id.* at 15).  Approximately eleven minutes later, Christner called Simmons to indicate that he had arrived, and Simmons told Christner to enter the location.  (*Id.*).

On June 21, 2012, at approximately 4:40 p.m., two investigators observed Simmons arrive and use keys to enter 350 Hudson Avenue.  (*Id.*).  According to Briganti, the GPS tracking device indicated that the Dodge Durango was located in the area of 350 Hudson Avenue during the time that the investigators reported observing Simmons at that location.  (*Id.*). Approximately seven minutes after he arrived, Simmons called Crane, who apparently was also at 350 Hudson, and asked her to look outside at a vehicle that he believed might belong to law enforcement.  (*Id.*).  Crane reported that she was not able to see the vehicle described by Simmons.  (*Id.*).

Approximately ten minutes later, Simmons and Crane exchanged text messages. (*Id.* at 16).  According to Briganti, Simmons instructed Crane to conceal items located at 350 Hudson, including baking powder, a scale and "other stuff," in the event that law enforcement arrived at the location.  (*Id.*).  According to Briganti, Crane agreed to do so.  (*Id.*).

On June 24, 2012, a phone call and text messages between Simmons and an unidentified woman were intercepted.  (*Id.* at 17).  According to Briganti, during the phone call, Simmons and the unidentified woman discussed the purchase of cocaine, and the woman agreed

to bring a large quantity of cocaine to Rochester, New York, to stay in the area while Simmons sold the cocaine, and to allow Simmons to pay her after the cocaine was sold.  (*Id*. at 18-19). According to Briganti, subsequent text messages suggested that Simmons was offering to pay $17,500 for one-half kilogram and $8,500 for ten ounces of cocaine.  (*Id.*).

Subpoenaed utility records indicated that Crane received gas and electric service at 11 Dejonge Street, but that her bills were mailed to 350 Hudson Avenue.  (*Id.* at 19). According to Briganti, he had also spoken with a reliable confidential informant who indicated that Simmons was involved in selling cocaine and with weapons.  (*Id.*).  The informant also reported stated that Simmons sometimes stored cocaine and weapons at 112 Durnan Street and 350 Hudson Avenue.  (*Id.*).

## II.   November 27, 2012 Identification Procedure

Briganti testified that he has been employed by RPD since 1997 and currently works as an investigator.[5]  On November 27, 2012, he and another RPD investigator, Jennifer Morales ("Morales"), met with a witness and conducted a photographic identification procedure as part of a narcotics trafficking investigation.  During the November 27th meeting, Briganti placed the photo array in front of the witness and stated that the witness might or might not recognize one or more of the individuals in the array.  Briganti instructed the witness that if he recognized any individuals depicted in the array, he should point to the person and identify the name of the individual.  Briganti testified that the witness almost instantly identified the individual depicted in photograph five.  Briganti asked the witness to circle the number above the identified photograph, write the name of the person depicted in that photograph, and sign the

---

[5]  The evidentiary hearing was recorded, but was not transcribed.  This Court's summary of the testimony during the hearing is based upon the recording.

array.  The witness circled number five, wrote the name "Shady" (a nickname by which the informant knew Christner), and signed the array.  Morales and Briganti also signed the photo array.  (Government's Exhibit ("G. Ex.") 1).

Briganti testified that while the witness was viewing the array, neither he nor Morales made any gestures or suggested which photograph to select.  Briganti also testified that the witness had not described Christner's physical characteristics prior to the identification procedure.

The array that the witness viewed contained six photographs of different Caucasian men.  (G. Ex. 1).  Photograph five depicted Christner.  (*Id.*).  All of the photographs showed men with facial hair, and all but one appeared to have shaved or balding heads.  (*Id.*).


### DECISION & ORDER

### I.     Bill of Particulars and Identification of Confidential Informants

I turn first to Crane's motion for a bill of particulars and for the identification of confidential informants.[6]  (Docket ## 219-1, 285).  Crane seeks additional particularization regarding the charges against her, including the factual basis for the weight of the narcotics alleged in the indictment, the quantities of drugs allegedly possessed by conspirators during Crane's participation in the conspiracy, the precise dates that Crane allegedly sold crack cocaine to a confidential informant (hereinafter "CW-2"), the types of drugs that Crane is alleged to have conspired to distribute, the identity of any unidentified co-conspirators, and the location of the

---

[6]  Crane also requested unredacted copies of the wiretap affidavits.  (Docket # 219-1 at ¶¶ 41-42).  Crane's counsel informed the Court by letter dated February 3, 2014 that the government had permitted him to review the redacted portions of the affidavits.

conspiracy that the indictment refers to as "elsewhere."[7]  (Docket # 219-1 at ¶¶ 14-20).  Crane

also seeks the identity of any confidential informants whose testimony will be used against her,

particularly the identity of CW-2.  (*Id.* at ¶¶ 27-29).

The government opposes the motion on the grounds that Crane sufficiently

understands the charges, and has access to substantial voluntary discovery, to make her request

unnecessary.  (Docket # 249 at 1-3).  Additionally, the government represents that it will disclose

the identity of its testifying confidential informants and any *Giglio* material prior to trial.  (*Id.* at

5-6).

During oral argument on December 19, 2013, at the Court's request, the

government described in general terms the information that had been provided to Crane during

discovery and also represented that CW-2 would testify during the trial of this matter.  The Court

directed the government to review the information Crane had requested, particularly the

information sought in paragraphs 19 and 20 of her motion, and to inform the Court whether the

government was willing to provide voluntarily any of the information sought by Crane.  The

Court also instructed Crane's counsel to advise whether, following any supplemental disclosures

made by the government, Crane still requested additional particularization.

On January 6, 2014, the government submitted a letter outlining the additional

particularization that it was willing to provide Crane.  With respect to her request for the specific

dates of the alleged crack cocaine sales, the government referred Crane to the allegations

contained in the criminal complaint affidavit (Docket # 1) and indicated that the purchases

occurred between February 2011 and August 2012, the period during which Crane was the

account holder for gas and electric service at 11 Dejonge Street.  According to the government,

---

[7]  Although Crane's motion was filed prior to the return of the third superseding indictment, Crane is
charged only in Count One of both indictments, and the allegations of each count are essentially identical.
(*Compare* Docket ## 215 *with* 362).

CW-2 bought cocaine from Crane on three separate occasions, each of which occurred at 11 Dejonge Street and involved the sale of approximately four "8balls" of crack.

   Additionally, referring to the complaint, the government indicated that CW-2 observed Simmons cooking crack at Crane's residence at 11 Dejonge Street in approximately November or December 2011.  Finally, the government stated that the complaint also contained allegations that Simmons used Crane's residence at 350 Hudson Avenue to process crack cocaine.  With respect to Crane's request that the government specify which of the drugs identified in the third superseding indictment she was alleged to have conspired to distribute, the government stated in its January 6, 2014 letter that "the information presently available to the government show[s] that powder cocaine and crack cocaine were the drugs which were reasonably foreseeable to [Crane] as being within the scope of the conspiracy."

   Crane submitted a letter and supplemental brief in further support of her request for particularization.  (Docket # 285).  Crane maintains that although the government has alleged that she participated in three separate sales of crack cocaine, the government has failed to sufficiently narrow the time frame of the alleged sales.  (*Id.* at ¶¶ 4-6, 12-15).  Crane contends that the government's failure to do so impedes her ability to investigate and prepare an alibi defense.  (*Id.*).  Accordingly, Crane requests that the government be directed to review its files for any information provided by the confidential informant and, if necessary, to interview CW-2 to obtain more specificity about the dates of the alleged sales.  (*Id.* at ¶¶ 15-17).  The government opposes any further particularization and represents that it has produced approximately 4,000 pages of discovery, including police reports, wiretap pleadings, search warrant pleadings and criminal histories, as well as wiretap recordings, photographs, defendant interview recordings and jailhouse recordings.  (Docket # 289 at 2).

The purpose of a bill of particulars is to enable the defendant "to identify with sufficient particularity the nature of the charge pending against h[er], thereby enabling [the] defendant to prepare for trial, to prevent surprise, and to interpose a plea of double jeopardy should [s]he be prosecuted a second time for the same offense." *United States v. Bortnovsky*, 820 F.2d 572, 574 (2d Cir. 1987) (citations omitted) (per curiam).  A bill of particulars is not to be used as a discovery device to obtain "evidentiary detail" about the government's case.  *See*, *e.g.*, *United States v. Torres*, 901 F.2d 205, 234 (2d Cir.) (citation omitted), *cert. denied*, 498 U.S. 906 (1990), *abrogated on other grounds by United States v. Marcus*, 628 F.3d 36 (2d Cir. 2010).  In other words, a bill of particulars should be granted where the information sought is "necessary" to prepare a defense and to avoid double jeopardy, not where it is merely "useful" to the defense in ascertaining the government's proof.  *See United States v. Henry*, 861 F. Supp. 1190, 1197 (S.D.N.Y. 1994); *see also United States v. Love*, 859 F. Supp. 725, 738 (S.D.N.Y.), *aff'd sub nom. United States v. Roberts*, 41 F.3d 1501 (2d Cir. 1994).  Where the charge against the defendant is broad in scope, a bill of particulars may be more appropriate than where the charged conduct is more narrow.  *See*, *e.g.*, *United States v. Barnes*, 158 F.3d 662, 666 (2d Cir. 1998) ("a bill of particulars or other adequate disclosure is appropriate where a conspiracy count covers a complex series of events over a number of years, but provides only the bare bones of the charge"); *United States v. Davidoff*, 845 F.2d 1151, 1154-55 (2d Cir. 1988) (district court abused discretion in denying a bill of particulars identifying victims in seven-year racketeering conspiracy; court noted that principles governing bills of particulars "must be applied with some care when the [g]overnment charges criminal offenses under statutes as broad as RICO").

To warrant a bill of particulars, the indictment's charges against a defendant must be so general that they fail to advise her of the specific acts of which she is accused.  *See United*

*States v. Torres*, 901 F.2d at 234; *United States v. Henry*, 861 F. Supp. at 1198.  In determining

that question, the court may consider whether the information sought by the defendant has been

made available in alternative forms, such as in discovery or prior court proceedings.  *See United*

*States v. Panza*, 750 F.2d 1141, 1148 (2d Cir. 1984); *United States v. Kelly*, 91 F. Supp. 2d 580,

583-84 (S.D.N.Y. 2000); *United States v. Ahmad*, 992 F. Supp. 682, 684 (S.D.N.Y. 1998);

*United States v. Feola*, 651 F. Supp. 1068, 1133 (S.D.N.Y. 1987), *aff'd*, 875 F.2d 857 (2d Cir.),

*cert. denied*, 493 U.S. 834 (1989).

   Having reviewed Crane's requests, the government's responses, the indictment,

and the materials before the Court on this motion, I conclude that Crane has been adequately

advised of the nature of the charges against her and the nature of the government's case.  Count

One of the indictment charges that Crane participated in a conspiracy to distribute various

narcotics, including powder cocaine and crack cocaine.  (Docket # 362 at 1-2).  The indictment

does not allege any overt acts committed by Crane, although the government maintains that

Crane's criminal conduct is described and reflected in the complaint, the affidavit in support of

the search warrant for her residence at 350 Hudson Avenue, the police reports identifying the

items seized during the execution of that warrant, and intercepted communications between

Simmons and Crane.  (Docket # 289 at 2).

   Those materials include allegations and information that in November or

December 2011 CW-2 observed Simmons "cooking crack" at Crane's residence on Dejonge

Street.  (Docket # 1 at ¶ 10).  CW-2 testified that Simmons was sometimes personally

unavailable to conduct a narcotics sale, and on three of those occasions, Simmons instructed

CW-2 to go to the Dejonge Street residence where Crane supplied CW-2 with approximately

four "8balls of crack."  (*Id.* at ¶ 11).  The government has represented that these sales occurred

sometime between February 2011 and August 2012, the period during which the gas and electric service for 11 Dejonge Street was in Crane's name.  (*Id.* at ¶ 10).

Additionally, as recounted above, Briganti's June 25, 2012 affidavit summarized intercepted communications between Simmons and Christner, and Simmons and Crane relating to activities at 350 Hudson Avenue.  (Docket # 219-5 at 14-16).  Those communications, surveillance of Crane's residence at 350 Hudson Avenue, and information from another confidential informant (hereinafter "CW-4") that Simmons stored cocaine and weapons at 350 Hudson Avenue, were included in Briganti's affidavit in support of a search warrant application for 350 Hudson Avenue.  (Docket # 219-6 at 7-14).  According to Briganti, based upon his knowledge and training, there was reason to believe that Simmons was utilizing 350 Hudson Avenue "to store, process and package cocaine for distribution."  (*Id.* at 14).

Crane maintains that she is entitled to additional particularization as to the precise dates or times that the three alleged sales to CW-2 occurred.  I disagree.  "There is no general requirement that the government disclose in a bill of particulars all the overt acts it will prove in establishing a conspiracy charge," *United States v. Carroll*, 510 F.2d 507, 509 (2d Cir. 1975), *cert. denied*, 426 U.S. 923 (1976), and requests for particularization of the "whens," "wheres" and "with whoms" of particular acts allegedly committed by a defendant in furtherance of a conspiracy are routinely denied, *United States v. Jimenez*, 824 F. Supp. 351, 363 (S.D.N.Y. 1993); *see also United States v. Barret*, 824 F. Supp. 2d 419, 439 (E.D.N.Y. 2011) ("the court finds that '[w]hat defendant[s] seek[ ] is in the nature of the "wheres, whens, and with whoms" that [c]ourts have held to be beyond the scope of a bill of particulars'") (quoting *United States v. Mitlof*, 165 F. Supp. 2d 558, 569 (S.D.N.Y. 2001)); *United States v. Muyet*, 945 F. Supp. 586, 599 (S.D.N.Y. 1996) ("[t]he defendants are not entitled to a bill of particulars setting forth the

'whens,' 'wheres,' and 'with whoms' regarding the [criminal] enterprise and conspiracy");

*United States v. Walker*, 922 F. Supp. 732, 739 (N.D.N.Y. 1996) ("detailed evidence of a

conspiracy is generally unavailable to defendants through a bill of particulars, and overt acts in

furtherance of the conspiracy need not be disclosed").  Judged under this caselaw, Crane is not

entitled to additional information from the government specifying the precise date or time of the

sales that she allegedly conducted.  *See*, *e.g.*, *United States v. Cephas*, 937 F.2d 816, 823 (2d Cir.

1991) (trial court properly exercised its discretion in denying request for bill of particulars in

prosecution for conspiracy to possess narcotics with intent to distribute; "[a]lthough the

government did not list the specific activities which showed how [defendant] furthered the

criminal enterprise or the conspiracy, such specific acts need not be alleged with respect to every

named defendant, if the indictment is otherwise sufficient and names the other persons involved

in the criminal activity"), *cert. denied*, 502 U.S. 1037 (1992); *Torres*, 901 F.2d at 233-34 (trial

court acted within its discretion in denying request for bill of particulars in narcotics conspiracy

case where defendant sought details concerning "precise dates and locations" of his alleged

activities in furtherance of the conspiracy); *United States v. Barret*, 824 F. Supp. 2d at 427, 439

(denying request for bill of particulars in narcotics conspiracy prosecution where defendants

sought information regarding their purported acts and alleged role in the conspiracy including

"exact date(s), time(s) and place(s)"); *United States v. Lawson*, 2010 WL 2671791, *6

(W.D.N.Y. 2010) (denying defendant's request for exact time and place of overt acts alleged in

indictment in drug conspiracy case where "[t]he charges in the [i]ndictment, along with the

discovery materials provided by the government, clearly inform the defendant of the essential

facts of the crimes charged"); *United States v. Muyet*, 945 F. Supp. at 600 (denying request for

bill of particulars in narcotics conspiracy case; "[a]lthough the [g]overnment is not even required

to prove a single overt act in furtherance of a narcotics conspiracy, . . . the indictment sets forth seven overt acts in the narcotics conspiracy count . . . [thus,] the information provided on the face of the [conspiracy count] 'is itself, more detailed than defendants have a right to demand with respect to the overt acts enumerated therein'") (quoting *United States v. Feola*, 651 F. Supp. at 1133); *United States v. Jimenez*, 824 F. Supp. at 363-64 (defendants in narcotics conspiracy prosecution were not entitled to "further specifics of the particular acts they are alleged to have participated in or for which they are being held responsible").

That Crane maintains the additional particularization is necessary in order to permit her to develop a potential alibi defense does not dictate a different result; "acquisition of evidentiary detail in the form of exact times of the acts alleged in the indictment for purposes of establishing an alibi is not the function of a bill of particulars." *United States v. Gonzalez*, 2014 WL 97323, *1 (S.D.N.Y. 2014) (quoting *United States v. Castro*, 2008 WL 5062724, *3 (S.D.N.Y. 2008)); *see United States v. Paiva*, 892 F.2d 148, 155 (1st Cir. 1989) (defendant's request for bill of particulars properly denied where defendant sought information concerning particular transactions alleged in the indictment; "the government's temporal specifications in the [i]ndictment, such as 'early 1983' and 'the fall of 1983,' were sufficiently narrow to allow [defendant] to prepare his [alibi] defense without surprise"); *United States v. Colson*, 662 F.2d 1389, 1391 (11th Cir. 1981) (trial judge properly denied request for additional particularization regarding the dates and locations of the defendant's alleged conduct in furtherance of the conspiracy despite defendant's contentions that absence of such information "impaired his ability to assert alibi defenses and to conduct out of court investigations of the unindicted co-conspirators"); *United States v. Hill*, 2012 WL 912948, *2 (W.D.N.Y. 2012) (defendant not entitled to bill of particulars specifying "the precise time of occurrence of alleged unlawful acts

18

attributed to defendant" in order to assist defendant to develop an alibi defense where criminal complaint and information provided by government informed defendant "of the essential facts of the crimes charged"); *United States v. Castro*, 2008 WL 5062724 at *3 ("acquisition of evidentiary detail in the form of exact times of the acts alleged in the indictment for purposes of establishing an alibi is not the function of a bill of particulars"); *United States v. McPherson*, 2009 WL 4756470, *3 (S.D.N.Y. 2009) (defendant not entitled to "additional details on the exact times and dates of [d]efendant's alleged illegal acts" where government had identified "the particular drug seizures in the discovery that the [g]overnment believe[d] it [could] link to [defendant]"; "[defendant's] assertion that additional information is required in order for him to mount an alibi defense [does not] justify a bill of particulars").

     With respect to the remaining particularization sought by Crane, including the basis for the weight of the narcotics alleged in the indictment, the quantities of narcotics allegedly possessed by the conspirators during the period of Crane's participation in the conspiracy, the identity of any unidentified co-conspirators, and the locations of conspiratorial conduct, I conclude that the charging documents and the discovery provided adequately advise Crane of the factual bases for the charges and the nature of the government's case.  On this record, I find that Crane has sufficient information to prepare her defense, to avoid unfair surprise, and to interpose a claim of double jeopardy, if appropriate.  *See United States v. Bortnovsky*, 820 F.2d at 574.

     I reach a similar conclusion with respect to Crane's request for immediate identification of confidential informants, including CW-2.  The disclosure of a confidential informant's identity is within the sound discretion of the district court, *DiBlasio v. Keane*, 932 F.2d 1038, 1042 (2d Cir. 1991), and the government generally is not required to disclose the

identity of confidential informants, *Roviaro v. United States*, 353 U.S. 53, 59 (1957).  In order to

obtain such disclosure, the defendant must show that without it, she "will be deprived of [her]

right to a fair trial."  *United States v. Fields*, 113 F.3d 313, 324 (2d Cir.), *cert. denied*, 522 U.S.

976 (1997); *United States v. Saa*, 859 F.2d 1067, 1073 (2d Cir. 1988) (defendant entitled to

identity of confidential informant only upon showing that it is essential or material to the

defense), *cert. denied*, 489 U.S. 1089 (1989).  A defendant's mere suggestion that disclosure will

be of assistance to the defense of the case is insufficient.  *United States v. Fields*, 113 F.3d at

324.  "[T]he district court must be satisfied, after balancing the competing interests of the

government and the defense, that the defendant's need for disclosure outweighs the

government's interest in shielding the informant's identity."  *Id.* (citing *Roviaro v. United States*,

353 U.S. at 62).  Such a need is established, according to the Second Circuit, "where the

informant is a key witness or participant in the crime charged, someone whose testimony would

be significant in determining guilt or innocence."  *United States v. Saa*, 859 F.2d at 1073.

        In the instant matter, Crane has failed to show how disclosure of the informants'

identities will be material to her defense.  Although Crane maintains that the identity of CW-2,

the informant to whom she allegedly sold narcotics, could potentially assist her investigation of a

possible alibi defense, "[m]ateriality is not . . . established simply by showing that the

confidential informant was a participant in and a witness to the crime charged."  *United States v.*

*Rijo*, 2006 WL 3056526, *2 (W.D.N.Y.), *report and recommendation adopted*, 2006 WL

3056523 (W.D.N.Y. 2006); *see also United States v. Flaharty*, 295 F.3d 182, 202 (2d Cir.)

("speculation that disclosure of the informant's identity will be of assistance is not sufficient to

meet the defendant's burden") (quoting *Fields*, 113 F.3d at 324), *cert. denied*, 537 U.S. 936

(2002).  In any event, the government has represented that the identity of CW-2 will be disclosed

to the defendant prior to trial, along with CW-2's grand jury testimony and any other *Giglio*

material (Docket # 249 at 6); "[t]his case, therefore, is not a situation where the informant exists,

but the [g]overnment declines to call him/her."  *United States v. Abney*, 2006 WL 625846, *1

(W.D.N.Y. 2006).


## REPORT & RECOMMENDATION

### I.    Motion to Suppress Wiretap Evidence

#### A.    Other Investigative Procedures

Under 18 U.S.C. § 2518(10), an "aggrieved person" may "move to suppress the

contents of any wire or oral communication intercepted pursuant to this chapter, or evidence

derived therefrom, on the grounds that (i) the communication was unlawfully intercepted; (ii) the

order of authorization or approval under which it was intercepted is insufficient on its face; or

(iii) the interception was not made in conformity with the order of authorization or approval."  18

U.S.C. § 2518(10)(a).  18 U.S.C. § 2510(11) defines an "aggrieved person" as "a person who

was a party to any intercepted wire, oral, or electronic communication or a person against whom

the interception was directed."  18 U.S.C. § 2510(11).  *See United States v. Fury*, 554 F.2d 522,

525 (2d Cir.) (a person "who has had his conversations intercepted during the wiretap" is an

aggrieved person), *cert. denied*, 433 U.S. 910 (1977).  The record plainly demonstrates, and the

government does not dispute, that Crane and Christner both have standing to move to suppress

communications intercepted over the target phone.

Crane and Christner both seek suppression of the intercepted communications on

the grounds that the supporting affidavits offered by Briganti failed to demonstrate that

traditional investigative procedures had been attempted and had proved unsuccessful.  (Docket

## 219-1 at ¶¶ 43-44, 46-47; 310 at ¶¶ 29-54).  In other words, according to Crane and Christner, Briganti's affidavits failed to justify the "need" for wiretap interception.  (*Id.*).

An application for wiretap authorization must contain "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous."  18 U.S.C. § 2518(1)(c).  A judge may approve a wiretap application only after determining that such a showing has been made.  18 U.S.C. § 2518(3)(c).  This requirement "is simply designed to assure that wiretapping is not resorted to in situations where traditional investigative techniques would suffice to expose the crime."  *United States v. Kahn*, 415 U.S. 143, 153 n.12 (1974).  In other words, the government need not "exhaust all conceivable investigative techniques before resorting to electronic surveillance," but must resort to telephonic surveillance only "when it is necessary to assist in law enforcement."  *United States v. Concepcion*, 579 F.3d 214, 218 (2d Cir. 2009); *United States v. Funderburk*, 492 F. Supp. 2d 223, 242 (W.D.N.Y. 2007) (the "other investigative procedures" requirement is not intended to turn electronic surveillance into a "tool of last resort").  "'Merely because a normal investigative technique is theoretically possible, it does not follow that is likely' to succeed."  *United States v. Crosby*, 2010 WL 4703615, *3 (W.D.N.Y.) (quoting *Torres*, 901 F.2d at 231-32), *report and recommendation adopted*, 2010 WL 4703596 (W.D.N.Y. 2010).  The wiretap application needs only to inform the issuing court "of the nature and progress of the investigation and of the difficulties inherent in the use of normal law enforcement methods."  *United States v. Concepcion*, 579 F.3d at 218 (quoting *United States v. Diaz*, 176 F.3d 52, 111 (2d Cir.), *cert. denied*, 528 U.S. 875 (1999)).

This Court's review of the issuing court's determination is not *de novo*; rather, the reviewing court must determine only whether "the facts set forth in the application were

minimally adequate to support the determination that was made." *Concepcion*, 579 F.3d at 218

(quoting *United States v. Miller*, 116 F.3d 641, 663 (2d Cir. 1997) (agent's assertion that

surveillance had been conducted unsuccessfully on numerous occasions was "minimally

adequate"), *cert. denied*, 524 U.S. 905 (1998)); *see also United States v. Miranda*, 1993 WL

410507, *2 (S.D.N.Y. 1993) (issuing court's determination concerning sufficiency of normal

investigative techniques is entitled to "substantial deference").  The reviewing court must test the

application in a "practical and commonsense fashion."  *Concepcion*, 579 F.3d at 218.

      Applying a practical, commonsense, and deferential review to the instant case, I

find that Briganti's affidavits were at least minimally adequate to support a finding that further

use of traditional investigative techniques appeared unlikely to succeed.  In his affidavit in

support of the June 15, 2012 warrant, Briganti identified the purpose of the investigation as

obtaining additional evidence pertaining to the shooting of CW-1 and the location of the weapon

that was used during the shooting.  (Docket # 219-4 at 38).  With respect to the June 25, 2012,

those purposes were reiterated, but broadened to include obtaining evidence pertaining to

narcotics trafficking by Simmons and his network.  (Docket # 219-5 at 32-33).

      Crane and Christner challenge the necessity of the wiretaps, contending that

traditional investigative means would have succeeded in achieving the objectives of the

investigation.  (Docket ## 219-1 at ¶¶ 43-44, 46-47; 310 at ¶¶ 29-54).  According to the

defendants, traditional investigative techniques, including witness interviews, execution of

search warrants, and review of subpoenaed jail phone recordings and rental car records, had

already uncovered the identities of the individuals who had participated in the shooting of CW-1,

the identity of the individual who had been renting vehicles for Simmons, and the location of

Simmons's vehicle and the target phone at various dates during the investigation.  (*Id.*).

Briganti affirmed, however, that although normal investigative techniques had produced evidence relating to both the shooting and the narcotics trafficking and distribution network, those investigative techniques had not accomplished and were not likely to accomplish the objectives of the investigation.  (Docket ## 219-4 at 38, 219-5 at 19).  For example, although surveillance techniques had been utilized, Briganti reported that Simmons employed techniques designed to avoid surveillance, including erratic traffic maneuvers, which made traditional surveillance techniques difficult to employ.  (Docket # 219-4 at 39-40).  Further, Briganti stated that intercepted communications revealed that Simmons was aware of surveillance and was able to describe several undercover vehicles used by law enforcement.  (Docket # 219-5 at 21-22).  In addition, law enforcement had been unable initially to install a GPS tracking unit on Simmons's vehicle because of the frequency with which it was moved from one location to another. (Docket # 219-4 at 39-40).

According to Briganti, traditional witness or victim interviews were also unlikely to be productive because witnesses and victims were likely to be reluctant to cooperate due to fear of retaliation.  (Docket ## 219-4 at 38; 219-5 at 20).  With respect to pen registers and toll records, Briganti attested that he had obtained the relevant records for the target phone number. (Docket ## 219-4 at 41; 219-5 at 22).  According to Briganti, although those records demonstrated that communications between the target number and other individuals had occurred, the records alone did not differentiate between innocent and incriminating phone calls. (*Id.*).

Briganti further explained that search warrants were not likely to be helpful in locating the weapon used in the June 5, 2012 shooting because the investigators could not establish probable cause to believe that the weapon was in any particular location.  (Docket

## 219-4 at 41-42; 219-5 at 23).  Finally, Briganti asserted that a grand jury investigation would be impractical and unlikely to be successful in achieving the goals of this investigation.  (Docket ## 219-4 at 42-43; 219-5 at 23-24).  According to Briganti, potential grand jury witnesses were likely to be hesitant to cooperate and presented a risk of disclosure of the existence of the grand jury investigation.  (*Id.*).

On this record, the Court is satisfied that Briganti adequately explained why traditional investigative methods risked jeopardizing the investigation and were unlikely to succeed.  For these reasons, and applying the legal standards described above, I reject Crane's and Christner's arguments that the wiretap orders are invalid because law enforcement did not exhaust other traditional investigative techniques.  *See Concepcion*, 579 F.3d at 218, 219 (law enforcement need not exhaust "all conceivable investigative techniques"; fact that "leads could have been better leveraged before resorting to a wiretap" does not mandate suppression where affidavit was otherwise "minimally adequate"); *United States v. Mitchell*, 2010 WL 55927, *5 (W.D.N.Y. 2010) (affidavits were sufficient where they asserted that informants and surveillance provided only "a limited picture of the drug distribution network").  In the two affidavits, Briganti sufficiently identified the traditional investigative techniques that had been utilized and adequately informed the issuing court why other techniques were unlikely to achieve the aims of the investigation.  Accordingly, I recommend that Crane's and Christner's motions to suppress the wiretap communications based upon the alleged failure to demonstrate the futility of other investigative techniques should be denied.

### B.  <u>Minimization</u>

Crane argues that the government failed to comply with its obligation under 18 U.S.C. § 2518(5) to minimize calls intercepted over the target number.  (Docket # 219-1 at

¶¶ 48-50).  That section requires that authorized interceptions "shall be conducted in such a way as to minimize the interception of communications not otherwise subject to interception."  18 U.S.C. § 2518(5).  Moreover, as the Supreme Court has recognized:

> During the early stages of surveillance the agents may be forced to intercept all calls to establish categories of nonpertinent calls which will not be intercepted thereafter.  Interception of those same type of calls might be unreasonable later on, however, once the nonpertinent categories have been established and it is clear that this particular conversation is of that type.

*Scott v. United States*, 436 U.S. 128, 141 (1978).

Unlike standing to challenge the issuance of a wiretap warrant, standing to challenge improper minimization requires the showing of a direct privacy interest.  *United States v. Fury*, 554 F.2d at 526; *United States v. Burford*, 755 F. Supp. 607, 613 (S.D.N.Y. 1991) ("[i]t is well settled law in this Circuit that to have standing to challenge improper minimization during a wiretap executed by the government, that a defendant must show a direct privacy interest").  To establish a direct privacy interest, a defendant must demonstrate a possessory or proprietary interest in the home in which the telephone is located or in the telephone itself.  *Fury*, 554 F.2d at 526; *United States v. Villegas*, 1993 WL 535013, *8 (S.D.N.Y. 1993); *United States v. Burford*, 755 F. Supp. at 613 (citing *United States v. Hinton*, 543 F.2d 1002, 1011-12 (2d Cir.), *cert. denied*, 429 U.S. 980 (1976)).  Moreover, as noted by the Second Circuit, even defendants who are named as targets of the investigation may lack standing to challenge law enforcement's minimization techniques if they did not have an expectation of privacy in the residence in which the tapped telephone was located.  *United States v. Ruggiero*, 928 F.2d 1289, 1303 (2d Cir.), *cert. denied*, 502 U.S. 938 (1991); *see also United States v. Poeta*, 455 F.2d 117, 122 (2d Cir.) (finding defendant lacked standing to raise minimization challenge concerning wiretap of

co-defendant's telephone), *cert. denied*, 406 U.S. 948 (1972); *United States v. Villegas*, 1993 WL

535013 at *8 (defendant lacked standing to challenge improper minimization of co-defendant's

cellular telephone).

    In the case at bar, the warrant applications identified the target cellular telephone

number as being utilized by Simmons; the line was subscribed to by Antwone Burroughs – not

Crane.  (Docket ## 219-4 at 25; 219-5 at 13).  The government opposes Crane's minimization

challenge on the grounds that she lacks standing to raise it.  (Docket # 249 at 9-10).  During oral

argument on the motion, Crane's attorney reserved the right to supplement her minimization

challenge after reviewing the redacted portions of the affidavits in support of the wiretap

warrants.  Despite having conducted such a review, Crane's counsel has not filed any

supplemental submissions demonstrating her standing to challenge minimization.  On this

record, I conclude that Crane has failed to demonstrate a direct privacy interest in the target

telephone line, and she therefore lacks standing to challenge the government's minimization of

calls intercepted over those lines.  Accordingly, I recommend that Crane's motion to suppress

intercepted conversations based upon improper minimization be denied.


## II.  <u>Validity of Search Warrant for 350 Hudson Avenue</u>

    Crane also challenges the validity of the search warrant for her residence located

at 350 Hudson Avenue.  (Docket # 219-1 at ¶¶ 51-53).  According to Crane, the warrant is

invalid because the probable cause for the warrant was derived primarily from information

learned through the wiretapped communications.  (*Id.*).  Crane argues that because the wiretap

warrants were invalid, the warrant for 350 Hudson Avenue is also invalid.  (*Id.*).  Having

concluded that the wiretap warrants were valid, however, I likewise conclude that the

investigators lawfully used information obtained through the execution of those warrants to establish probable cause for the search warrant for 350 Hudson Avenue.  Accordingly, I recommend denial of Crane's motion to suppress evidence seized from 350 Hudson Avenue.

III.    **Motion to Suppress Identification**

Finally, I turn to Christner's motion to suppress evidence of a photographic identification.  (Docket # 310 at ¶¶ 11-17).

Evidence of an out-of-court photographic identification will be suppressed under the due process clause if "the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." *Simmons v. United States*, 390 U.S. 377, 384 (1968).  In determining whether to exclude evidence of a pretrial identification, a court must first consider whether the identification procedure was unduly suggestive.  *Id.*  To decide whether a photographic array is unduly suggestive, a court should consider several factors, including "the size of the array, the manner of presentation by the officers, and the array's contents."  *United States v. Maldonado-Rivera*, 922 F.2d 934, 974 (2d Cir. 1990), *cert. denied*, 501 U.S. 1233 (1991).  Specifically, the court must consider "whether the picture of the accused . . . so stood out from all the other photographs as to suggest to an identifying witness that [the accused] was more likely to be the culprit."  *Jarrett v. Headley*, 802 F.2d 34, 41 (2d Cir. 1986) (internal citations omitted).

If the identification procedure was unduly suggestive, the court must proceed to determine whether the identification nevertheless possesses "sufficient aspects of reliability." [8] *United States v. Bubar*, 567 F.2d 192, 197 (2d Cir.) (citing *Manson v. Brathwaite*, 432 U.S. 98,

---

[8]  This Court bifurcated the *Wade* hearing and addressed only the issue of whether the procedure was unduly suggestive.

109-17 (1977)), *cert. denied*, 434 U.S. 872 (1977).  "Even if the procedure was unnecessarily (or impermissibly) suggestive . . .[,] a district court may still admit the evidence 'if, when viewed in the totality of the circumstances, it possesses sufficient indicia of reliability.'"  *United States v. Bautista*, 23 F.3d 726, 729-30 (2d Cir.) (footnote omitted) (quoting *United States v. Simmons*, 923 F.2d 934, 950 (2d Cir.), *cert. denied*, 500 U.S. 919 (1991)), *cert. denied*, 513 U.S. 862 (1994).

On the record before the Court, I find that the identification procedure at issue was not unduly suggestive.  First, the manner in which the officers presented the array to the witness in no way suggested to the witness which, if any, photograph to select.  The record establishes that the witness was instructed that he might or might not be able to recognize any of the individuals depicted in the array.  The testimony further establishes that the witness identified the photograph of Christner almost immediately when the array was shown to him.  As instructed, the witness circled the number associated with Christner's photograph and wrote the nickname by which he knew Christner next to the photograph.

I also find that the array itself was not unduly suggestive.  Christner's photograph is one of six photographic images of different Caucasian men of roughly similar ages.  All are head shots and feature men with beards and moustaches, and all but one (not Christner) appear to have shaved heads or receding hairlines.  The individuals depicted have similar physical characteristics.  *United States v. Rijo*, 2009 WL 4406055, *4 (W.D.N.Y. 2009) (photo array not unduly suggestive where the six photographs depicted "men of similar age, complexion, build, hair color and eye color").  Accordingly, I recommend that the district court deny Christner's motion to suppress the photographic identification.

## CONCLUSION

For the reasons stated above, Crane's motion for a bill of particulars and for disclosure of the identities of confidential informants (**Docket # 219**) is **DENIED**.  Further, for the reasons stated above, I recommend that the district court deny Crane's and Christner's motions to suppress wiretap evidence, Crane's motion to suppress tangible evidence seized from 350 Hudson Avenue, and Christner's motion for suppression of evidence of a photographic identification procedure.  (**Docket ## 219, 310**).

**IT IS SO ORDERED.**

*s/Marian W. Payson*
MARIAN W. PAYSON
United States Magistrate Judge

Dated: Rochester, New York
       October 27, 2015

Pursuant to 28 U.S.C. § 636(b)(1), it is hereby

      **ORDERED**, that this Report and Recommendation be filed with the Clerk of the Court.

      **ANY OBJECTIONS** to this Report and Recommendation must be filed with the Clerk of this Court within fourteen (14) days after receipt of a copy of this Report and Recommendation in accordance with the above statute and Rule 59(b) of the Local Rules of Criminal Procedure for the Western District of New York.[9]

      The district court will ordinarily refuse to consider on *de novo* review arguments, case law and/or evidentiary material which could have been, but was not, presented to the magistrate judge in the first instance.  *See*, *e.g.*, *Paterson-Leitch Co. v. Mass. Mun. Wholesale Elec. Co.*, 840 F.2d 985 (1st Cir. 1988).

      **Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order.**  *Thomas v. Arn*, 474 U.S. 140 (1985); *Small v. Sec'y of Health & Human Servs.*, 892 F.2d 15 (2d Cir. 1989); *Wesolek v. Canadair Ltd.*, 838 F.2d 55 (2d Cir. 1988).

      The parties are reminded that, pursuant to Rule 59(b) of the Local Rules of Criminal Procedure for the Western District of New York, "[w]ritten objections . . . shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for such objection and shall be supported by legal authority."  **Failure to comply with the provisions of Rule 59(b) may result in the District Court's refusal to consider the objection.**

      Let the Clerk send a copy of this Order and a copy of the Report and Recommendation to the attorneys for the parties.

**IT IS SO ORDERED.**

                                         *s/Marian W. Payson*
                                         MARIAN W. PAYSON
                                     United States Magistrate Judge

Dated: Rochester, New York
       October 27, 2015

---

[9]  Counsel is advised that a new period of excludable time pursuant to 18 U.S.C. § 3161(h)(1)(D) commences with the filing of this Report and Recommendation.  Such period of excludable delay lasts only until objections to this Report and Recommendation are filed or until the fourteen days allowed for filing objections has elapsed.  *United States v. Andress*, 943 F.2d 622 (6th Cir. 1991); *United States v. Long*, 900 F.2d 1270 (8th Cir. 1990).